UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X

| | |
|---|---|
| Serge Fradkoff, | Civil Action No.: |
| *Plaintiff*, | |
| — against — | **COMPLAINT** |
| Ronald Winston; William Stadiem; Skyhorse Publishing; and Simon & Schuster; | **Jury Trial Demanded** |
| *Defendants*. | |

-----------------------------------------------------------X

Plaintiff, Serge Fradkoff ("Fradkoff" or "Plaintiff"), by his attorneys Salzano, Ettinger, Lampert & Wilson LLP, alleges as follows:

## NATURE OF THE ACTION

1.      It is axiomatic that a reputation is earned slowly and lost quickly.

2.      Plaintiff Serge Fradkoff is a Renaissance man who has established himself as a respected figure in several noteworthy fields and has dedicated a significant part of his career to building a reputation as a preeminent and trusted jeweler.

3.      In the realm of jewelry and gems, Mr. Fradkoff is renowned for the 20 years he spent alongside jeweler Harry Winston, the first five of which he was learning the trade, the next 14 as the right-hand man of Harry Winston, and the last as working under the mandatory instructions and close supervision of the latter's eldest son, Ronald Winston. During all those years, Mr. Fradkoff demonstrated unparalleled expertise in the acquisition and sale of magnificent gems.

1

4.  Beyond the world of gems, Mr. Fradkoff's contributions span across arts, culture, film, medical innovation, and finance.

5.  Although Mr. Fradkoff is not a public figure, he is well known in private circles among high-net-worth individuals for his work as an exquisite jeweler, champion bridge player, art collector, horse-racing enthusiast, finance executive, and film producer.

6.  On or about fall 2023, Defendant Ronald Winston and Defendant William Stadiem co-authored a book titled *King of Diamonds: Harry Winston, the Definitive Biography of an American Icon*, which was published by Defendant Skyhorse Publishing and distributed throughout the United States by Defendant Simon & Schuster (the four named defendants are collectively referred to herein as "Defendants").

7.  In *King of Diamonds*, Defendants make a multitude of defamatory and disparaging false statements about Plaintiff. As detailed more fully herein, numerous statements and excerpts are false, disparaging, and misleading, and may cause significant harm to Mr. Fradkoff's reputation and character.

8.  Among the numerous defamatory statements, most troubling are the various excerpts that allege Plaintiff committed serious crimes such as theft.

9.  Defendants' defamatory claims that Mr. Fradkoff is a thief are repeated numerous times in the book, where Defendants state—without providing any factual evidence—that Mr. Fradkoff has committed "high crimes" and "thievery." *See, e.g.,* Winston & Stadiem, *King of Diamonds*, at 277, 285-286.

10. In addition to the numerous false and defamatory statements that allege a serious crime, *King of Diamonds* contains a long list of false facts and disparaging remarks that defame

Plaintiff. Non-exhaustive lists of examples of these false facts and disparaging remarks are summarized later in this Complaint.

11. Defendants' defamatory statements were made with malicious intent and have caused financial and reputational harm to Plaintiff, which is precisely what Defendants intended when they made and published the outlandish accusations.

12. Following Defendants' explosive and unfounded statements, counsel for Mr. Fradkoff contacted Defendants and urged Defendants to retract the false accusations. Defendants refused to comply with the request, thus doubling-down on their malicious and defamatory statements against Mr. Fradkoff.

13. The defamatory statements also have caused substantial mental anguish to Mr. Fradkoff, who has been struggling to repair his reputation following the maliciously false accusations made by Defendants.

14. Mr. Fradkoff brings this Complaint against Defendants for defamation.

## JURISDICTION AND VENUE

15. This is an action for damages in an amount in excess of the minimum jurisdictional limits of this Court.

16. This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1332 (diversity jurisdiction) in that it is a civil action between citizens of different States and involves an amount in controversy in excess of $75,000 (exclusive of interest and costs).

17. Venue is proper in this District pursuant to 28 U.S.C. § 1391, as Defendant Skyhorse Publishing maintains a place of business in this District, Defendant Simon & Schuster maintains a place of business in this District, Defendant Stadiem is an attorney licensed to practice law in the State of New York, Defendant Winston maintains a residence in this District,

Defendants' defamatory statements were published in this District, and Defendants' defamatory statements reached this District.

## THE PARTIES

18. Serge Fradkoff is an individual who is a citizen of both France and Switzerland and maintains a residence at 55 Avenue de Champel, 1206 Geneva, Switzerland.

19. Defendant Ronald Winston, upon information and belief, is an individual who resides at 256 Griffen Avenue, Scarsdale, New York 10583.

20. Defendant Ronald Winston, upon information and belief, is a co-author of the book, *King of Diamonds*, and owns the copyright to the book, *King of Diamonds*.

21. Defendant Ronald Winston, upon information and belief, has assigned certain copyright rights of *King of Diamonds* to Defendant Skyhorse Publishing and/or Defendant Simon & Schuster.

22. Defendant William Stadiem, upon information and belief, is an individual who resides at a beachfront property at 101 California Avenue, Unit 607, Santa Monica, California.

23. Defendant William Stadiem, upon information and belief, is a co-author of the book, *King of Diamonds*, and has assigned certain copyright rights of *King of Diamonds* to Defendant Ronald Winson, Defendant Skyhorse Publishing, and/or Defendant Simon & Schuster.

24. Defendant William Stadiem, upon information and belief, is an attorney and an active member of the bar of the State of New York.

25. Defendant Skyhorse Publishing, upon information and belief, maintains an office at 307 West 36th Street, 11th Floor, New York, New York 10018.

26. Defendant Skyhorse Publishing, upon information and belief, is the publisher of the book *King of Diamonds*.

27. Defendant Skyhorse Publishing, upon information and belief, distributes books, including but not limited to *King of Diamonds*, through Defendant Simon & Schuster.

28. Defendant Skyhorse Publishing, upon information and belief, has been assigned, and continues to maintain, certain copyright rights to the book *King of Diamonds*.

29. Defendant Simon & Schuster, upon information and belief, maintains an office at 1230 Avenue of the Americas, New York, New York 10020.

30. Defendant Simon & Schuster, upon information and belief, is the U.S. distributor of the book *King of Diamonds*.

31. Defendant Simon & Schuster, upon information and belief, has been assigned, and continues to maintain, certain copyright rights to the book *King of Diamonds*.

## FACTUAL ALLEGATIONS

**A.     Serge Fradkoff's Remarkable Reputation and Achievements**

32. Mr. Fradkoff's journey began with a solid educational foundation in Switzerland, where he pursued an MBA equivalent, laying the groundwork for his diverse career path.

33. A renowned jeweler, Mr. Fradkoff spent 20 years alongside Harry Winston, the first five of which he was learning the trade, the following 14 as a key component of celebrated jeweler, and the last as working under the instructions and supervision of the latter's eldest son, Ronald Winston. Throughout this tenure, Mr. Fradkoff exhibited unmatched expertise in his ability to identify and acquire rare gems.

34. Mr. Fradkoff also has worked on notable transactions for clients that included Stavros Niarchos, and countless corporate executives, heads of state, royalty, and renowned collectors.

35. Mr. Fradkoff's entrepreneurial spirit led him to establish Serge Fradkoff SA Precious Stones, further cementing his status as a connoisseur and professional in the gemstone industry.

36. Beyond the world of gems, Mr. Fradkoff's contributions span across arts, culture, medical innovation, film, and finance.

37. In the 1970's, Mr. Fradkoff served as a co-owner of the globally renowned magazine *Connaissance des Arts*. One of his notable contributions to the art world was the donation of a painting by Claude Monet to the esteemed Louvre Museum, a gesture made alongside his partner. Additionally, independent of his gemstone firm, Mr. Fradkoff personally donated an impressive diamond weighing 12.38 carats with exceptional optical features to the French Museum of Natural History in Paris.

38. Mr. Fradkoff's financial acumen is evident in his substantial stake (33%) and advisory role in Unigestion, a private bank, in Geneva, where he was the *de facto* advisor to the Chairman and CEO. Alone and without any help whatsoever (investment banker or lawyer), he navigated major financial transactions, including the acquisition of 50% in Banca della Svizzera Italiana, at the time the fourth largest bank in Switzerland, for an amount of $390 million (the equivalent of $1 billion today).

39. Mr. Fradkoff's passion for horses led to remarkable achievements in horse racing and thoroughbred breeding, further diversifying his portfolio of interests and successes. In particular, he won a number of major races in France, Ireland and the United States, and one of his horses, Perrault, was nominated for the U.S. "Champion Male Turf Horse" in 1982.

40. His life, characterized by diverse interests and accomplishments, reflects a deep dedication to excellence, innovation, and meaningful influence in a range of industries.

41. Although he is not widely known to the general public, Mr. Fradkoff's reputation, built on a foundation of intellectual rigor, strategic acumen, and cultural sophistication, marks him as a respected and distinguished figure in various global circles among high-net-worth individuals.

42. It is a reputation in which Mr. Fradkoff takes great pride, and which has been well-earned.

**B.    Defendants' Defamatory Statements Against Fradkoff**

43. In the book, *King of Diamonds*, Defendants make outrageously false accusations against Plaintiff.

44. *King of Diamonds* contains a multitude of defamatory and disparaging false comments about Plaintiff. As detailed more fully herein, numerous statements and excerpts are false, disparaging, misleading, and may cause significant harm to Mr. Fradkoff's reputation and character.

45. Among the numerous defamatory statements, most troubling are the various excerpts that allege Plaintiff committed serious crimes such as theft.

46. For example, on page 277, referring explicitly to Plaintiff, Defendant Winston states that "I sensed they were stealing my family's money." Winston and Stadiem, *King of Diamonds*, at 277.

47. Later in the book, again referring directly to Plaintiff, Defendants Winston and Stadiem state that "it takes a thief to catch a thief" and that "there was honor among thieves." Winston and Stadiem, *King of Diamonds*, at 285-286. In the context of the book, these statements are reasonably read to assert that Mr. Fradkoff is a thief.

48. Still more, Defendants Winston and Stadiem refer to Plaintiff's conduct "not only a high crime but a major disaster in the making." Winston and Stadiem, *King of Diamonds*, at 326.

7

On that same page Defendants double down, referring again to Plaintiff's conduct as "thievery." *Id*.

49. In addition to the numerous false and defamatory statements that allege a serious crime, *King of Diamonds* contains a long list of false facts that defame Plaintiff. A non-exhaustive list of examples of these false facts is summarized in the table below:

| **Non-Exhaustive List of False Facts in *King of Diamonds*** ||
| **Page Number** | **False Fact** |
| --- | --- |
| 270 | "Serge presented himself as the wizard of the Casbah, a pied noir or North African Jew from Tunis. Bochatay would later insist that Serge was actually a Polish Jew from Lodz and was passing as a Tunisian to give him more mystique" |
| 271 | "Serge was tiny and actually did resemble Harry Winston to a degree that the narcissistic Serge liked to pass himself off to people who didn't know better as Dad's illegitimate son" |
| 271 | "He also passed himself off as one of the great bridge players of Europe" |
| 271 | "Bochatay had the Arabs and Imelda Marcos" |
| 271 | "Fradkoff had the wealthy European Jews who survived the war" |
| 271 | "and, most important, the less glamorous but highly profitable rough diamonds, which he traded in Antwerp" |
| 271 | "I guess Serge troubled me the most, if only because of his insinuations that he was my half-brother" |
| 285-86 | "from the increasingly wealthy reconstructed Jewish families of Europe" |
| 285-86 | "Fradkoff was becoming every day more and more a Jewish prince of the realm" |
| 285-86 | "undoubtedly aided by his relentless allusions to his Winston family bloodline" |
| 285-86 | "Fradkoff was entrenching himself in the sport of kings, horseracing" |
| 285-86 | "sharing ownership of steeds with the oil billionaire Hunt brothers of Texas" |
| 285-86 | "The European press took notice and anointed Fradkoff the young genius of horse studs but never mentioned that he also worked for Harry Winston" |
| 287 | "Dad would always bring his right-hand man from Geneva, Nick Akselrod" |

| | |
|---|---|
| 290 | "Harry Winston simply could not delegate" |
| 311 | "Geneva's favorite rumor, that Serge was Harry Winston's out-of-wedlock son, was assiduously cultivated by [him]. Nothing in his mind could have been more flattering" |
| 311 | "What he didn't like was, beginning in the mid-1970s, Serge's obsession with his own publicity. Stories about him began appearing in English, French and Swiss papers about the 'young genius' with nary a mention of the 'old genius', the genuine one who was his boss and mentor. Much was made of Serge's segue from being a bridge champion to the Prince of Diamonds" |
| 311 | "When he came to New York to see his steeds compete in the Belmont Stakes, Harry Winston was not even mentioned" |
| 312 | "I did attempt to intervene and effect a rapprochement. To that end, I asked to meet Serge. He invited me to his apartment, filled with Chagall paintings" |
| 326 | "In 1978, Serge had gotten involved with his new horse-world billionaire pals, the Hunt brothers of Texas, in their quest to corner the market on silver" |
| 326 | "In the first half of 1979, the price of silver jumped from 6 dollars a troy ounce to nearly 50 dollars" |
| 326 | "I immediately dismissed Serge, demanding full restitution of our money. Otherwise, I threatened to go to the fisc, as the French call the financial authorities" |
| 326 | "With silver still sky high, Serge paid us back in full" |
| 326 | "In his bitter end with Harry Winston, Serge Fradkoff was not widely missed" |
| 327 | "Just as the Hunts, abated by Serge Fradkoff and unknowingly by us, were creating a silver rush" |
| 358 | "Since Fradkoff's shtick was that he was the secret son of Harry Winston, he didn't want to have a brother casting a shadow on his claim" |

50. *King of Diamonds* also contains a long list of disparaging comments that defame Plaintiff. A non-exhaustive list of examples of these disparaging comments is summarized in the table below:

| **Non-Exhaustive List of Disparaging Comments in *King of Diamonds*** ||
|---|---|
| **Page Number** | **Disparaging Comment** |
| 269 | "three devils", "seeds of destruction" |

9

| 269 | "two slick operators named Albano Bochatay and Serge Fradkoff" |
| 269 | "I came to see them as the three horsemen of the Apocalypse" |
| 270 | "There was only so much intrigue even an intriguer like Fred could take" |
| 270 | "This was Serge Fradkoff, who was as dark and scowling as Bochatay was charming and light" |
| 271 | "What a talker he was but such were the ways of the Casbah" |
| 271 | "The more successful he got, the more he began to develop his 'style', which was a Jewish version of a Times Square pimp in Shaft" |
| 272 | "all drunk with the love of money" |
| 277 | "Besides all that bonhomie, I sensed an increasingly sinister ambiance, particularly in Bochatay and Fradkoff. There was nothing tangible, just a slight whiff of putrescence" |
| 277 | "He also had a need for yes-men" |
| 311 | "Dad loved Serge's Sunday souks, held in the Winston Grand Salon" |
| 312 | "Harry felt betrayed by Serge, outraged by his flamboyant narcissism" |
| 312 | "He told Nick and Sue that Serge was 'the biggest disappointment of his life'" |
| 326 | "That mission was to fire Serge Fradkoff, who was about to destroy Harry Winston before I could even have a fair chance to run it" |
| 326 | "Serge escaped legally unscathed" |
| 358 | "With an auction on, all sorts of characters came out of the woodwork, including Serge Fradkoff in Geneva" |

51. Taken together, the defamatory statements made by Defendants in *King of Diamonds* include serious allegations that Plaintiff committed a crime, false facts, and disparaging statements.

52. Defendants' defamatory statements will likely result in irreparable damage to Mr. Fradkoff's personal and professional life. The statements have no basis in fact whatsoever, and were intended to inflict harm upon Mr. Fradkoff.

53. All of Defendants' foregoing statements regarding Plaintiff are false.

54. Plaintiff did not provide authorization to Defendants to make any of the aforementioned statements.

55. On information and belief, the foregoing statements of Defendants were made and published (i) with actual malice and knowledge of their falsity, and (ii) with the design and intent to harm Plaintiff in his profession.

**C.     Defendants' Defamatory Statements Reached a Broad Audience**

56. Defendants' defamatory statements reached a very broad audience.

57. The book *King of Diamonds* is distributed by Defendant Simon & Schuster, one of the largest and best-known publishing houses in the United States and globally.

58. *King of Diamonds* is available for sale at online and in brick-and-mortar bookstores, including but not limited to Amazon.com, Barnes & Noble (online and brick-and-mortar), Target (online and brick-and-mortar), Walmart (online and brick-and-mortar), and countless other venues throughout the United States and in other nations.

59. *King of Diamonds* has been reviewed by several outlets, including *The New York Times*. *See* Melanie Abrams, *The Story of the King of Diamonds*, N.Y. Times (Sept. 7, 2023); *see also* Samantha Dunn, *'King of Diamonds' Explores the Dramatic Life of Jeweler Harry Winston*, Orange County Register (Sept. 20, 2023); Todd Sliss, *Oldest Son Chronicles Life of Diamond Pioneer Harry Winston*, The Scarsdale Inquirer (Aug. 24, 2023); Ashley Davis, *A New Book Delves Into the Dramatic Life of Harry Winston*, National Jeweler (June 27, 2023); M.J. Rose, *'King of Diamonds' Reviews Harry Winston's Many Facets*, The Adventurine (Dec. 18, 2023).

60. The aforementioned articles represent just a small subset of publications regarding *King of Diamonds*, and help demonstrate that the book has reached a broad audience.

**D.     Defendants Knew, or Should Have Known, that Their Statements Were False**

61. Defendants knew, or should have known, that their accusations were false at the time that they made them.

11

62. There is absolutely no evidence that Plaintiff has engaged in any criminal conduct, let alone theft as Defendants allege in *King of Diamonds*.

63. Defendant Stadiem is an attorney duly licensed in the State of New York, and thus knew or should have known the elements necessary to allege that Plaintiff has committed a crime.

64. As an attorney, Defendant Stadiem's specialized knowledge of the law made him uniquely positioned to notify Defendants Winston, Skyhorse, and Simon & Schuster regarding the defamatory elements in *King of Diamonds*, including but not limited to the false allegations that Plaintiff committed a crime.

65. Defendant Stadiem also has a questionable reputation as an author.

66. According to an article published in *The New York Times*, Defendant Stadiem is known to be an author who collaborates on "gossipy tell-alls." *See* Janet Maslin, *Big Money and Mischief in Reagan-Era Hollywood*, N.Y. Times (Dec. 24, 2012). The *Times* piece indicated that Defendant Stadiem, in a previous book titled *Moneywood: Hollywood in Its Last Age of Excess*, "squirts poison . . . with out-of-control malice." *Id*. In that book, according to the *Times* article, Defendant Stadiem "constantly identifies his book's moneymen as Jewish, even when they aren't." *Id*.

67. A separate review of Defendant Stadiem's work echoed the comments from *The New York Times* regarding Stadiem's questionable tactics and motivations. Specifically, one article stated that Stadiem's "chatty memoir/history mashup formula doesn't work," and that he exhibits a "preference for gossipy anecdote over smart analysis." *See* Andy Lewis, *Moneywood Book Review: A Gossipy Account of Hollywood's '80s "Age of Excess" from one of the Decade's Bit Players Comes Up Short*, The Hollywood Reporter (Jan. 18, 2013). Lewis's review also indicated

that Stadiem's work in the book "yields stock portraits . . . that repeatedly fall back on the key traits of Jewish or WASPy." *Id*.

68. Yet another review of Defendant Stadiem's work, in the influential Kirkus Reviews, concluded that Defendant Stadiem provides "sketchy research" and a "dull, gossipy rendering of days past, bereft of candor or narrative verse." *Moneywood: A Dull Gossipy Rendering of Days Past, Bereft of Candor or Narrative Verve*, Kirkus Reviews (Oct. 6, 2012). The Kirkus review further stated that Defendant Stadiem "mines every scrap of Hollywood gossip . . . situating the book as an in-depth investigation." *Id*.

69. In a review of Stadiem's book, *Jet Set: The People, the Planes, the Glamour, and the Romance in Aviation's Glory Years* (Ballantine Books 2014), the *Washington Post* describes the book as one that is "woefully lacking" in both "clarity and focus." Jonathan Yardley, *Book Review: "Jet Set,"* The Washington Post (June 13, 2014). The *Washington Post* noted that Defendant Stadiem's book is "a chaotic stew" that "lurches around from topic to topic" and amounts to an "indigestible bouillabaisse." *Id*. The *Post* article highlighted that Defendant Stadiem's "prose soars wildly over the top" and offered the following remarks regarding Defendant Stadiem:

> People wouldn't pay good money to attend a concert by a "pianist" who can't play the piano or buy a recording by a "singer" who can't sing, so why is it that they seem perfectly willing to pay for books "written" by "writers" who can't write? The utter, perhaps congenital, inability to construct a coherent and pleasing sentence rarely seems to prevent people from getting their books published and readers from gobbling them up. "Jet Set" proves the point as persuasively as any book to cross my desk in a long time.

*Id*.

70. Still more, some have stated that a book on Marilyn Monroe that Defendant Stadiem co-authored was fabricated. *See, e.g.,* David Marshall, *Book Review: Marilyn Monroe Confidential* (accessed Feb. 9, 2024).[1]

71. Thus, *King of Diamonds* is not the first book authored and published by Defendant Stadiem that contains false factual claims, disparaging remarks, and/or defamatory statements.

72. Defendant Stadiem's reputation as an author was, or should have been, known to Defendant Skyhorse Publishing and Defendant Simon & Schuster.

73. In light of Defendant Stadiem's previous, questionable tactics as an author, Defendant Skyhorse Publishing and Defendant Simon & Schuster each should have taken reasonable steps to ensure that the statements made in *King of Diamonds* were factually accurate and not defamatory.

74. Because Defendant Skyhorse Publishing and Defendant Simon & Schuster each failed to take reasonable steps to verify the factual allegations in *King of Diamonds*, each is responsible for the defamatory statements in the book.

75. Defendant Skyhorse Publishing and Defendant Simon & Schuster knew, or should have known, of the Defendant co-authors' statements in *King of Diamonds*, and their defamatory nature.

76. Defendants' motivations for their false and defamatory statements are not difficult to discern—making outrageous statements sells books.

77. Book sales are further bolstered by media accounts that highlight controversial elements in books, particularly defamatory statements. Indeed, upon information and belief, Defendants intentionally included false and defamatory statements in *King of Diamonds* in order

---

[1] Available at: http://www.marilynmonroe.ca/camera/books/16.html.

14

to provoke a lawsuit from Plaintiff, which would place *King of Diamonds* further into the public limelight and help sell more books. This follows the ubiquitous mantra and any publicity is good publicity. But, it falls entirely at the expense of Plaintiff, who has had his good name and reputation defamed.

78. Thus, upon information and belief, Defendants' false accusations against Plaintiff may be an attempt to promote the sale of *King of Diamonds*—and indeed may have been part of a formal marketing and promotion plan—thus bringing significant revenue directly to Defendants.

79. Additionally, upon information and belief, Defendant Winston is attempting to damage Plaintiff's reputation and business.

80. This would permit Defendant Winston to use illegal or improper conduct to increase his personal standing.

**E.     Fradkoff Has Suffered Damages Due to Defendants' Defamatory Statements**

81. Plaintiff has suffered, and will continue to suffer, significant financial and reputational damages due to Defendants' defamatory statements.

82. The world of high-class gems is closely knit, with only a handful of individuals and companies vying for the right to work with premier clients. Plaintiff's strengths as a connoisseur, businessman, and patron of the arts have been core components of his undisputed integrity in the business.

83. Defendants' defamatory statements are therefore particularly damaging to Plaintiff in his business.

84. The negative impact of Defendants' defamatory statements about Plaintiff have been magnified because once Defendants initiated their false and scandalous allegations, they have been repeated and paraphrased by news outlets throughout the United States and internationally.

85. These additional publications and paraphrasings of Defendants' defamatory statements were foreseeable, and, on information and belief, Defendants anticipated and desired such additional publications in order to cause even more injury to Plaintiff's business and reputation.

86. The defamatory statements also have caused substantial mental anguish to Mr. Fradkoff, who has been struggling to repair his reputation following the maliciously false accusations made by Defendants.

## COUNT ONE

### (Defamation)

87. Plaintiff repeats and realleges each and every allegation in paragraphs 1 through 86 as if fully and completely set forth herein.

88. Defendants made their false and defamatory statements deliberately and maliciously with the intent to intimidate, discredit, and defame Plaintiff.

89. Defendants have made statements of fact against Plaintiff that are false.

90. At the time Defendants made the statements, Defendants knew, or should have known, that the statements were false.

91. Defendants' statements were made in print via publication of the book, *King of Diamonds*, among other public outlets and to other public persons. The statements were not privileged.

92. Defendants' statements were published to a broad audience.

93. Defendants deliberately made the statements knowing they would be disseminated to a broad audience and would harm Plaintiff's reputation and good standing. Defendants acted with spite and malice when making the defamatory statements. As intended by Defendants,

Defendants' defamatory statements were, in fact, widely published and disseminated around the world, including in the Southern District of New York.

94. Given the absence of any evidence to substantiate Defendants' statements, Defendants issued the statements with actual knowledge that such statements were false and in reckless disregard for their falsity. In either case, Defendants issued these statements intending to harm Plaintiff.

95. Defendants' statements have harmed Plaintiff's reputation in the public, impute the commission of a crime, and/or call into question Plaintiff's fitness to perform his work in his trade and profession.

96. Defendants' false statements constitute defamation, as Defendants knew that the statements were going to be transmitted in writing and widely disseminated in print and electronic media. Defendants intended their false statements to be published and available to the public internationally, and Defendants' false statements were, in fact, published and made available globally, including within the Southern District of New York.

97. Defendants' false statements constitute defamation *per se*, including that they accused Plaintiff of a crime, and including that they exposed Plaintiff to public contempt, ridicule, aversion, and disgrace, and induced an evil opinion of Plaintiff in the minds of right-thinking persons.

98. Defendant's false statements also constitute libel *per se*, inasmuch, among other reasons, as they tended to injure Plaintiff in his professional capacity as a premier businessman in the diamond trade, and inasmuch as they intended to destroy Plaintiff's credibility and reputation among members of the diamond trade community.

99. Because Defendants' conduct was undertaken in bad faith and with fraud, malice, and oppression, Plaintiff is entitled to punitive damages.

100. Defendants knowingly made false statements to third parties with actual malice and knowledge of their falsity, and which tended to injure Plaintiff in his profession constituting defamation *per se*.

101. As a consequence of Defendants' defamatory statements, Plaintiff is entitled to monetary damages in an amount to be determined at trial.

102. Defendants' false statements have caused, and continue to cause, Plaintiff economic damage and reputational harm, and other direct and consequential damages and losses.

103. Plaintiff is also entitled to recover punitive damages from Defendants since Defendants made their defamatory statements: (i) with knowledge of their falsity and/or with wanton and reckless disregard for their truth; and (ii) Defendants' decision to defame was motivated by hatred, ill will, spite, and/or a criminal mental state as directed at Plaintiff.

104. Punitive and exemplary damages are necessary in this case to deter Defendants and others from wantonly and maliciously using a campaign of lies to discredit Plaintiff and other reputable businesspeople.

**PRAYER FOR RELIEF**

**WHEREFORE**, plaintiff demands judgment against defendants, and each of them, for:

1. Compensatory damages according to proof, but in excess of the $75,000 jurisdictional requirement;

2. Punitive damages in the sum of not less than $100,000,000;

3. Interest as allowed by law;

4. Costs of suit; and

5. Such other and further relief as this court may deem just and proper

### JURY DEMAND

Plaintiff hereby demands a trial by jury on all causes of action asserted within this pleading.

Dated:  New York, New York
        March 11, 2024

                                SALZANO ETTINGER LAMPERT & WILSON, LLP

                        By:     _____
                                Frank Salzano, Esq.
                                Jason Lampert, Esq.
                                104 West 40th Street, 14th Floor
                                New York, New York 10018
                                Tel: (212) 417-0429
                                Fax: (646) 365-3119
                                *Attorneys for Plaintiff*